**Arek and Judy MANDELBAUM,**
**Respondents,**

v.

**CITY OF KANSAS CITY, Appellant.**

**No. WD 55596.**

Missouri Court of Appeals,
Western District.

April 13, 1999.

Lana Torczon, Asst. City Atty., Kansas City, for Appellant.

Jay Jensen, Kansas City, for Respondent.

SPINDEN, Presiding Judge.

Kansas City's municipal government appeals the circuit court's judgment awarding damages to the owners of a building which was damaged when the city ordered demolition of an adjacent building. The city tore down the adjacent building after declaring it to be dangerous. The city contends that the circuit court erred in finding that it was responsible for the demolition company's negligence, and that, because a party wall joined the two buildings, the city failed in its duty to give to the building owners direct notice of the adjacent building's demolition. We reverse the circuit court's judgment because it is not supported by substantial and competent evidence.

Arek and Judy Mandelbaum owned the building at 3231–3235 Troost Avenue in Kansas City. Before October 1990, the city determined that the building at 3239–3241 Troost Avenue, south of the Mandelbaums' building, was dangerous and had to be demolished because it was a public nuisance. On October 10, 1990, city officials scheduled a hearing to consider demolishing the building and sent notice of the hearing to Herman Fielder, owner of the building. They also posted notice of the hearing on the building itself.

Arek Mandelbaum saw the notice posted on Fielder's building, but he did not attend the hearing on November 7, 1990, or take any steps to learn of the city's proposed action. At the hearing, city authorities decided that Fielder's building was dangerous. They de-

clared it to be a public nuisance and scheduled it for demolition. City officers posted notice of this decision on the building. The Mandelbaums did nothing in response to this notice.

The city contracted with Franklin Wrecking Company for it to tear down Fielder's building, and Franklin Wrecking began demolition in September 1992. City officials ordered the demolition to stop in mid-October when removal of the north wall portion of Fielder's building caused the removal of part of the Mandelbaums' roof and exposed the upper parts of the Mandelbaums' building, including an interior wall. To protect the Mandelbaums' building, Franklin Wrecking covered the exposed portion with plastic and secured it with a wooden frame.

On October 22, 1992, city officials sent a letter to Arek Mandelbaum which said, "If you wish to have [the north wall of Fielder's building] remain you need to reach an agreement quickly with the owner, Mr. Herman Fielder, and Mr. James Franklin, wrecking contractor." The Mandelbaums did not respond. In November 1992, the city hired a structural engineer, Donald McMican, to inspect the buildings and to make recommendations.

In a letter to the city officials, McMican opined that Fielder's building was built before the Mandelbaums' building and that the Mandelbaums' building was not attached to the north wall of Fielder's building and did not rely on it for support. He concluded that the Mandelbaums' building relied on Fielder's building for shielding from the weather and lateral wind loads. He recommended that, if the remaining wall were removed, modifications should be made to the Mandelbaums' building for weather protection and to provide for wind load resistance. His report also said that the roof of the Mandelbaums' building was not supported by Fielder's building and was not supported properly by the structure of the Mandelbaums' building; therefore, the building would require modification to provide adequate support for the roof. Another option, he suggested, was to restore the missing parts of the north wall of Fielder's building and to attach the wall to the Mandelbaums' building.

On December 15, 1992, city officials sent Arek Mandelbaum another letter informing him that the structural engineering report revealed that the remaining wall was not connected structurally to the Mandelbaums' building and was not supporting his building. They also reported that a survey revealed that the wall was not on the Mandelbaums' property. They advised Mandelbaum to reach an agreement with Fielder concerning solutions and gave him 30 days to do so. Mandelbaum did not respond.

On April 9, 1993, city officials sent letters to Mandelbaum and Fielder asking them to state their intentions before April 16, 1993. Mandelbaum did not respond. In November 1993, in a follow-up report, McMican said that his opinion about the wall had not changed.

City officials ordered Franklin Wrecking to tear down the remainder of the north wall of Fielder's building. Franklin Wrecking completed the work in November 1993. The newly-exposed south wall of the Mandelbaums' building revealed a first floor wall composed of brick and a second story wall composed of heavy timber studs.

On October 23, 1996, the Mandelbaums sued the city for damages to their building. They alleged that the city or its agents had negligently damaged their building's roof (Count I) and had negligently left their building without support and protection from the elements by negligently removing a "party wall" (Count II). The circuit court ruled for the Mandelbaums on both counts and awarded them $23,500 in damages.

 In its first point, the city contends that the circuit court erred in ruling for the Mandelbaums on Count I of their petition. They argue that the Mandelbaums did not attempt to show any independent action by the city which caused damage to the roof of the Mandelbaums' building but focused entirely on what Franklin Wrecking did without establishing that Franklin Wrecking was the city's agent. The city contended that Franklin Wrecking acted as an independent contractor, not as its agent. The circuit court's judgment for the Mandelbaums necessarily meant, the city argues, that the cir-

cuit court found that Franklin Wrecking was the city's agent, and the Mandelbaums presented no evidence establishing agency. We agree.

In Count I of their petition, the Mandelbaums averred:

... [B]efore December 14, 1992, through November 17, 1993, the [city] by its agents, employees and contractors negligently and carelessly demolished the property commonly known as 3229–41 Troost such that the demolition process caused damage to the building of the [Mandelbaums].

... [A]s a direct and proximate result of the negligence and carelessness of [the city], its agents, employees, and contractors in demolishing said structure the [Mandelbaums were] damaged in the sum of $1,500.00.

Although the Mandelbaums alleged that the city was liable for acts "by its agents, *employees* and contractors,"[1] the Mandelbaums did not endeavor to prove any act giving rise to the city's liability other than acts by Franklin Wrecking. It did not endeavor to show negligence by the city's employees. Hence, the Mandelbaums' only theory of liability was that the city was liable for Franklin Wrecking's actions because Franklin Wrecking was the city's agent.

By alleging an agency relationship between the city and Franklin Wrecking, the Mandelbaums had the burden of proof. *Jennings v. City of Kansas City*, 812 S.W.2d 724, 733 (Mo.App.1991). The Mandelbaums presented no evidence which established that Franklin Wrecking was the city's agent.

The Mandelbaums argue that their evidence showed that an implied agency existed between the city and Franklin Wrecking. They contend that no one disputed "that the demolition contractor was working for the [city] under the demolition orders introduced at trial," and they point to Franklin Wrecking's actions of stopping work and not resum-

ing until the city told it to resume. We disagree.

To prove that Franklin Wrecking was the city's agent, the Mandelbaums were obligated to establish that Franklin Wrecking had the power to alter the city's legal relations with others, that it was the city's fiduciary in carrying out the work, and that the city controlled the way it carried out its demolition of the building. *State ex rel. Bunting v. Koehr*, 865 S.W.2d 351, 353 (Mo. banc 1993). The Mandelbaums did not establish that the city had sufficient control of Franklin Wrecking's work.

■ The Mandelbaums argue that Franklin Wrecking's asking for advice from the city about the Mandelbaums' building established that the city controlled the demolition work. We disagree. The city did order a temporary halting of work after Franklin Wrecking informed it of damage to the roof of the Mandelbaums' building. We find no evidence whatsoever that the city exerted any other level of control. Simply setting the beginning and ending points of a contractor's work, without controlling methods and otherwise supervising the work, is not sufficient to establish agency. *Williamson v. Southwestern Bell Telephone Company*, 265 S.W.2d 354, 358 (Mo.1954).

The Mandelbaums' failure to prove that Franklin Wrecking was the city's agent necessarily meant that the Mandelbaums did not prove that the city was liable for Franklin Wrecking's negligent acts. We, therefore, reverse the circuit court's judgment awarding $1500 damages to the Mandelbaums for Count I.[2]

Concerning Count II, alleging the city's negligent removal of a party wall, the city argues that the circuit court erred in finding for the Mandelbaums because the city owed no duty to the Mandelbaums regarding the alleged party wall. It also contends that the circuit court's determination that a party wall

1. We added the emphasis.

2. The Mandelbaums also argue that the issue of whether Franklin Wrecking was an independent contractor is "irrelevant" because the city was liable for acts of trespass by even an independent

contractor. Because they did not raise the issue of trespass in the circuit court, we will not consider the issue on appeal. *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36 (Mo. banc 1982).

existed was against the weight of the evidence.

■ A "party wall," or a wall shared and jointly used by adjoining property owners to support their separate buildings, "does not create any form of joint or common ownership by the adjoining land owners. Each retains title to the half of the wall upon his land and gains an easement for support in the half on his neighbor's land." *Contemporary Management, Inc. v. 1007 Olive Partnership*, 760 S.W.2d 135, 137 (Mo.App.1988). Party walls typically result from contracts between the adjoining owners, from statutes, or by prescriptive easements arising from uses consistent with adverse possession. 69 C.J.S. *Party Walls* §§ 5 and 9 (1951).

■ The Mandelbaums admit that no contract existed between them and Fielder regarding their mutual use of the north wall of Fielder's building. The city presented evidence that a deed search of the property revealed no party wall agreements between the adjoining landowners. The Mandelbaums did not contend that a party wall easement of support arose from statutes existing at the time the wall was created. They merely make the unsubstantiated assertion that "the demolished wall was a party wall[;] i.e. a wall for the mutual benefit of both parties." The Mandelbaums do not establish the requisite elements for a prescriptive easement of support in Fielder's wall.[3]

The undisputed evidence established that the Mandelbaums' and Fielder's buildings had separate walls.[4] Fielder's north wall rested entirely on his property. The Mandelbaums' building did not rely on Fielder's building for support. The beams which supported the Mandelbaums' building were supported by the Mandelbaums' south wall. The Mandelbaums' building was not connected in any way to Fielder's building except for their overlapping roof lines and one point where the two walls had been "hooked" together. Both walls may have shared the same foundation.

The Mandelbaums contend that this evidence—that the properties shared a common footing, that the Mandelbaums' roof extended over the wall, and that portions of Fielder's wall exhibited bricked over windows—established a party wall. We disagree. The Mandelbaums did not establish that they had any right to use Fielder's wall either by contract or through prescriptive use.

■ Moreover, even if the Mandelbaums had established a party wall, they did not establish that anyone owed them a duty of continued support once the adjoining building fell into such a state of disrepair that the city declared it to be dangerous. When a wall which had served as a party wall ceases to exist, the easement of support terminates. 69 C.J.S. *Party Walls* § 11(b) (1951). *See Guzzardo v. City Group, Inc.*, 910 S.W.2d 314 (Mo.App.1995); *Paola Lodge 147 of Independent Order of Odd Fellows v. Bank of Knob Noster*, 238 Mo.App. 96, 176 S.W.2d 511 (1943).

The Mandelbaums presented no evidence of an agreement to continue support. They, therefore, failed to establish a duty for either Fielder or the city to compensate them for repair of their wall.[5]

■ Finally, the city contends that the circuit court erred in determining that it did not give adequate notice and hearing to the Mandelbaums concerning the north wall of Fielder's building as required by §§ 67.400–67.450, RSMo 1994. The Mandelbaums essentially contended at trial that the city was obligated to give separate notice to them concerning the north wall of Fielder's build-

---

3. A right of easement to use a wall as a party wall requires continuous, uninterrupted use by the parties as a party wall for the statutory prescriptive period, and the use must be adverse, and not permissive, as well as open and notorious. 69 C.J.S. Party Walls § 9. Failure to establish each of those elements defeats the party's claim. Contemporary Management, 760 S.W.2d at 138.

4. Ordinarily, a party wall contemplates a single wall erected equally on the dividing line of two adjoining properties owned by different people which supports adjoining structures equally. 69 C.J.S. Party Walls, § 1.

5. The Mandelbaums rely on *Larabee v. City of Kansas City*, 697 S.W.2d 177 (Mo.App.1985), and on *Lambert v. City of Emporia*, 5 Kan.App.2d 343, 616 P.2d 1080 (1980). We distinguish these cases on their facts.

ing after stopping demolition of the main part of Fielder's building.

Section 67.400 authorized Kansas City's municipal government to adopt an ordinance authorizing it to declare a building or a structure to be a nuisance and to require the demolition or repair of the building or structure. Kansas City, pursuant to this authority, adopted ordinances regulating dangerous buildings and structures. Kansas City Code of General Ordinances §§ 20.126–20.132 (1984).[6] The city acted under these ordinances to demolish Fielder's building—not, as the Mandelbaums contend, under §§ 67.400–67.450.

Kansas City's ordinances provide that city building inspectors who judge a particular building or structure to be dangerous are obligated to notify the "owner and all other interested parties" of the finding and to permit them 10 days to repair or to demolish the building. Section 20.127(e)(3). Those included in the definition of "party" are "the owner, occupant, lessee, mortgagee, agent or any person having an interest in a building or structure, as shown by the land records of the recorder of deeds or director of records of the county wherein the land is located." Section 20.127(c). The notice is to be made by personal service or certified mail, but, if service cannot be made, then by publication along with posting of the notice on the dangerous building. Section 20.127(e)(3). If the parties do not begin repairing or demolishing their buildings within 10 days of the notice, the director of Neighborhood and Community Services must hold a hearing after giving "all parties having an interest in such building" notice at least 21 days before the hearing. Section 20.127(f)(2). This notice must be sent by certified mail or by personal service, but, if service cannot be made, notice may be posted on the building. *Id.*

The Mandelbaums do not dispute that the city searched the deed records and complied with its ordinances' notice requirements. Even assuming that the wall was a party wall, the Mandelbaums did not establish that any document establishing the party wall's existence had been recorded to notify the city of the party wall. The Mandelbaums,

therefore, were not "parties" to whom the city was obligated to give notice. Moreover, Arek Mandelbaum admitted that he saw the notice of the hearing posted on the building but took no action.

■ The Mandelbaums also argued that the city was obligated to give new notice after it stopped demolition of Fielder's building. Nothing in the ordinances supports this proposition. City authorities had declared Fielder's building to be dangerous before the demolition started. The wall about which the Mandelbaums complain was a part of that building. The temporary halting of the demolition did not change the building's status as a dangerous building needing to be demolished.

The Mandelbaums had notice of the demolition and did nothing. After the demolition stopped, city officials notified them three times that they needed to act to protect their interests, but they did nothing. We find no support in the law or the facts for the circuit court's judgment. We, therefore, reverse it.

EDWIN H. SMITH, Judge, and ALBERT A. RIEDERER, Judge, concur.

---

6. Effective January 1, 1995, the city recodified these sections as §§ 56.531–56.546.